Tyler Jordan Torres
223 Hayes Circle
Marina, CA 93933
(805) 769-0636
tyler.j.torres10@gmail.com

**FILED**
Nov 15 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY   s/jenniferv   DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Tyler Jordan Torres,

Plaintiff,

v.

San Diego County,
Lie-Chala Wilson,
San Diego Police Department,
Donald Meeks,
Frances Minton,

Defendants,

Case No.: **'19 CV 2182 CAB RBB**

**COMPLAINT**

## I. RELATED CASES

a. Do you have other Civil Case(s) in this or any other federal court?

☒ Yes ☐ No

b. b. If yes, please list the case numbers here: 3:19-cv-00126-EMC

**II. STATEMENT OF CLAIM** *(Briefly state the facts of your case. Describe how each defendant is involved, and tell what each defendant did to you that caused you to file this suit against them. Include names of any other persons involved, dates, and places.)*

1

I. THE COUNTY OF SAN DIEGO DENIED THE PLAINTIFF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE COUNSEL BASED ON THE SUPERIOR COURT OF CALIFORNIA, SAN DIEGO COUNTY COURT ' S QUESTIONING OF ASSIGNED COUNSEL IF SHE WAS DRINKING DURING THE TRIAL AND THE CONFLICT OF INTEREST THAT EXISTED BETWEEN ASSIGNED COUNSEL AND THE VICTIMS (SAN DIEGO POLICE DEPARTMENT) OF THE CASE AND NEVER COMMUNICATED TO THE PLAINTIFF.

On September 14, 2012, I, the plaintiff, Tyler Jordan Torres, was convicted of two counts of PC 245(a) Assault on a Peace Officer Likely to Produce Great Bodily Injury; two counts of PC 12022.7 Enhancement of Infliction of Great Bodily Injury; two counts of PC 69 Resisting with Violence; and one count PC 243 Battery on a Peace Officer. The plaintiff was sentenced to 9 years 4 months in the California Department of Corrections and Rehabilitation (CDCR). The plaintiff was confined within CDCR until re-sentenced on June 19, 2019, under AB 865 (Veterans with PTSD) and released July 6, 2019 to the supervision of California Department of Corrections and Rehabilitation Division of Adult Parole.

At the plaintiff ' s resentencing hearing on June 19, 2019, the Court conceded that the plaintiff had ineffective assistance of counsel with assigned counsel Deputy Public Defender Lei-Chala Wilson claiming the plaintiff suffered from Post-Traumatic Stress Disorder (PTSD) and negligently submitting a court ordered psychiatric evaluation reflecting that the plaintiff DID NOT suffer from PTSD omitting all prior U.S. Department of Veteran Affairs (VA) records of diagnosis and treatment prior to the incidents of which the plaintiff was convicted. The trial court went on to state (2 RT, pp. 58-59; Exhibit A):

CONTINUED IN ATTACHMENTS (PAGE 5)

**III.    RELIEF YOU REQUEST** *(State exactly what you want the court to do for you. Do not use this space to state the facts of your claim.)*

WHEREFORE, Plaintiffs pray for relief as follows:

1. For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2. For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3. For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

4. For punitive damages in an amount to be determined at trial;

5. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

6. For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

7. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), and other laws; and

8. For such other and further relief as this Court deems just and proper.

Respectfully submitted,                              Dated:  November 15, 2019

Tyler Jordan Torres

**IV.   DEMAND FOR JURY TRIAL** *(Would you like a trial by jury on all claims pursuant to FRCP, Rule 38?)*

☒ Yes    ☐ No

I declare under penalty of perjury that the foregoing is true and correct.

NOVEMBER 15, 2019
Date

Signature

TYLER JORDAN TORRES
Printed Name

## ATTACHMENTS

**ARGUMENT I (cont.)**

> At the time of sentencing his lawyer recommended that I put him in a veterans' facility instead of sending him to prison. But instead of giving me the materials that documented his PTSD diagnosis, she gave me a psych eval by a current psychologist. He hadn't reviewed any of the prior records, and he found that there was no PTSD. And I relied on that at the time of sentencing, and I said that's why I'm giving the sentence: I don't find any validity to this PTSD diagnosis. Again, you two have been in my courtroom many times. You know that I review every word that is filed in every case. That should have been considered by this Court way back at the time of sentencing. This man had had a documented history of PTSD. I can't say what I would have done if I had had all the records that Ms. Fernandez has now produced, but I really do think that that's what this new provision is all about, Mr. Kennedy. It is all about in a situation where someone has a mental health issue as a result of their work in the military, that that is something the Court should be taking into account at the time of sentencing. And through no fault of Mr. Torres', his lawyer didn't get that information to the Court, and she should have. These were local records. All she would have had to do was subpoena these local records just like Ms. Fernandez did and present them to the Court.

(2 RT, p. 60)

But I just -- I feel very saddened that I was not provided the proper information when I imposed what all of you know was a very, very severe sentence in this case.

This is the same judge that question Lie-Chala Wilson whether she was drinking during the first two days of trial and continued to deny the pleas for new counsel by the plaintiff during the three Marsden hearing held throughout the course of the trial. (Closed Hearing Transcript – September 18, 2012; Exhibit B):

**Page 5 Lines 4 – 17:**

THE COURT: I'm not sure how to deal with this issue. I haven't had this come up in 22 years, but I do feel concerned enough about it that I wanted to just put it on the record.

Ms. Wilson, yesterday when we were at sidebar in the afternoon, I did smell a very strong odor of alcohol.

5

And my staff has been reporting this to me --

MS. WILSON: I'm surprised.

THE COURT: --this morning and through yesterday.

Obviously, as the overseer of the trial and in light of the Marsden which was filed yesterday and some of the issues discussed in that, which I'm not going to go over in the presence of Mr. Romo, I do have a concern about whether you are consuming alcohol during this case.

The plaintiff requested three *Marsden* hearings throughout the course of the trial pleading for new representation. Prior to trial proceedings, which began on September 17, 2012, the plaintiff requested a *Marsden* hearing asking the court for new representation complaining Ms. Wilson was unfamiliar with the case, refuse to contact and discuss case matters, and was unprepared for trial (RT, pp. 1-5; Exhibit C). Judge Joan Weber denied the request. The following morning, September 18, 2012, Judge Joan Weber questioned if Lie-Chala Wilson had been drinking the first two days of trial. Deputy Public Defender Lei-Chala Wilson denied the accusation. The court took Wilson's word as an "Officer of the Court" and trial proceedings continued.

The plaintiff requested two more Marsden hearings, the second hearing held Semptember 19, 2012 (In Camera Proceedings, pp. 7-17; Exhibit D) and the third held November 2 , 2012 (Closed Marsden Hearing, pp. 1-5; Exhibit E), complaining that Lei-Chala Wilson was omitting case critical evidence in the form of two YouTube videos which showed San Diego Police beating the plaintiff while handcuffed and the official statement by SDPD Lt. Goldberg to the media stating the plaintiff threw his dog at police and attacked them for no reason contradicting police discover and trial testimony (Exhibit F); officer reports and discovery contradicting victim testimony (Exhibits G-I); and failing to challenge prosecution witness testimony found in their testimonies and that discovery. The plaintiff was denied both times after begging the court for new representation.

6

The concession of ineffective assistance of assigned counsel during the initial sentencing phase adds validity to the plaintiff's claims he made during the three *Marsden* hearings complaining of the same type of conduct in regards to the omission of case critical evidence as it relates to the omission of supporting documents of PTSD diagnosis of the plaintiff at the original sentencing.

If not drunken incompetence, then the conflict of interest between assigned counsel and the victims of the case impaired the plaintiff's Sixth Amendment constitutional right to effective assistance of counsel. Lie-Chala Wilson had a working relationship with the San Diego Police Department in her role as president of the National Association for the Advancement of Colored People (NAACP) that was never communicated to the plaintiff. The San Diego Police Department are the victims of the case. In her role as president of the NAACP, Wilson worked with the San Diego Police Department on relationships amongst minority communities. This relationship was exposed by the plaintiff's initial appellant attorney who failed to raise it on appeal; however, communicated it to the plaintiff through multiple letters between client and counsel (Exhibit K). It raises the question: Did assigned Wilson pull her punches to remain in good standing in her working relationship with the San Diego Police Department. Punches in the form of omission of case critical evidence, failing to challenge witness claims, failure to point out in consistencies in witness testimonies, the sealing of the appellant's VA diagnosis and treatment history, and the submission of a psychiatric evaluation that contradicted her claim the appellant suffered from PTSD. All of which the appellant informed the court of in the *Marsden* hearings as he pleaded for new representation or the court conceded to during his re-sentencing.

Deputy Public Defender Lie-Chala Wilson had the duty to inform the plaintiff of her working relationship with the San Diego Police Department and failed to do so. The court had the duty to protect the plaintiff's Sixth Amendment right and failed to do so.

I. **THE PLAINTIFF'S FOURTH AMENDMENT RIGHT WAS VIOLATED WHEN SAN DIEGO POLICE ATTMEPTED TO SIEZE THE PLAINTIFF WITH THE USE OF ILLEGAL FORCE AND TACTICS WHICH WERE THEN COVERED UP WITH LIES TO JUSTIFY THEIR ENTRY INTO THE PLAINTIFF'S HOME PURJURING THE PLAINTIFF THROUGHOUT ALL LEGAL PROCEEDINGS.**

On December 15, 2011, Officers Frances Minton and Donald Meeks responded to a noise complaint at the apartment of the plaintiff in the neighborhood Pacific Beach in the San Diego, CA. San Diego Police Officers Meeks (RT, p. 130; Exhibit L) admits to knocking on the plaintiff's door and failing to announce himself as a police officer. Officer Minton admits to covering the peephole of the plaintiff's door (RT, pp. 160, 196-197, Exhibit M). The plaintiff opened the door slightly in response to the loud knocking on his door. As he did, the plaintiff's puppy made a break for the door in attempting discover the new individuals (Minton and Meeks). The plaintiff prevented the puppy's escaping the apartment as best he could by slightly shutting the door and grabbing the only thing he could, the puppy's tail and guiding him away from the door. The puppy then hid under the bed in the plaintiff's apartment.

Officer Meeks immediately escalated the situation yelling "That's no way to treat your dog!" and kicked in the plaintiff's door and attacked the plaintiff in his home. Attacking the plaintiff, Meeks punched the plaintiff and then attempted to drag the plaintiff to the floor or out of his apartment. The plaintiff is an Iraq veteran suffering from post-traumatic stress disorder (PTSD). Reacting to the attack, the compaintant started pushing as Meeks was pulling catching Meeks off balance. The momentum pushed Meeks out of the plaintiff's apartment into the

8

entrance hallway. As both Meeks and the plaintiff passed through the doorway, Minton punched the plaintiff to the right side of his head and in the struggle Meeks was on the floor and against the door of the plaintiff's neighbor, Roger Kunesh, the plaintiff in the middle sandwiched between Meeks on the floor and Minton attacking the plaintiff from the top. As he lied on the ground in front of both doorways, Meeks deployed his taser point-blank to the left upper thigh/butt cheek of the plaintiff. Reacting, the complainant shrugged Minton from off his back and punched Meeks four times to the face until it was clear he was no long conscious and therefore no longer a threat. The plaintiff got up from kneeling on the ground and as he did, Minton deployed her taser from the main hallway striking the plaintiff's chest in the entrance hallway. The plaintiff pulled out the taser barbs and retreated back into the safety of his apartment.

The plaintiff's claims are verified by the plaintiff's neighbor, Roger Kunesh, who testified to seeing the plaintiff strike Meeks and, no matter how much the District Attorney Investigator lead his testimony, testified he did not see the plaintiff strike Minton, as she claims, in both his trial testimony (RT, pp. 147-153; Exhibit N) and the prosecutions telephone interview (Transcription of District Attorney - Telephone Interview, pp. 5-7; Exhibit O). The physical evidence of prosecution discovery, omitted from trial by assigned counsel (Argument 1), found in both Officer Minx's report (Exhibit I) describing the position, serial numbers, and officer they belonged to verify the description of events as described by the plaintiff and the photos of the plaintiff's apartment (Exhibit J).

Officer Minton and Meeks changed their story multiple times to justify their entrance and attempted seizure of the plaintiff. The initial report to the media made by SDPD Lt. Brian Goldberg was that he talked to both officers (Minton and Meeks) directly and that they reported

9

that the plaintiff threw his dog at them and then attacked them for no reason. Multiple article from the media and press as well as a YouTube video, omitted by Lie-Chala Wilson at trial (Exhibit F), confirm these accusations made by both Minton and Meeks.

The stories continued to change as they could not explain why Meeks' hat was in the plaintiff's apartment. Both officer failed to write report as they claim "victims do not write reports"; however, provided verbal reports to other officers who then wrote reports. Officer Julie Adams took Meeks report in which he changed his story to reflect the "[plaintiff] grabbed the dog by the tail and flung the dog onto the sofa inside the apartment." (Exhibit G). This claim is then repeated in his preliminary hearing testimony to describe the complaintnant "…throws the dog back towards the sofa. It hits the top of the sofa and into the wall." "…[plaintiff] probably threw him ten feet or more." (Preliminary Examination, p. 35; Exhibit P). These accusations could have stood except the fact the plaintiff **DID NOT** have a sofa in his apartment forcing Meeks to change his fallacies yet again. At the trial he simple reports the dog was thrown "across the room, hitting the wall on the other side of the room." (RT, pp. 117-118; Exhibit L).

Minton's claim's change in a like manner from Lt. Goldberg's report to the media and press to her report to Officer Thomas Slater (Exhibit H) that the "[plaintiff] picked the dog up and flung it back into the apartment with an underhand fling. The dog was about two feet off the ground when it hit some boxes about five feet away." As in the case with Meeks' claims of "sofa" the plaintiff did not have boxes in his apartment forcing her to change her story at the Preliminary Examination (Exhibit Q, pp. 71-72, 83-84) to "thrown back into the apartment." At trial her story grew to include the wall, "… and the [plaintiff] grabbed the dog by the tail and grabbed it with his right hand and threw it against the wall behind him." (RT, p. 162, Exhibit M).

10

Minton needs to refresh her memory using Officer Thomas Slater's Report (Exhibit H) stating under direct examination (RT, p. 164):

> **Minton:** I could refresh my memory, but my report is not here. If I said more than that I apologize.
> **Romo:** Did you write a report or did you give a statement to another officer?
> Minton: We – as victims, we do not write reports.
> Romo: If I showed you a copy of a report that was made from your statement, do you think that might help?
> Minton: Yes, sir.

Minton reviews the report which clearly reads "boxes" and on cross examination "… he picked the dog up, threw it, it hit that wall, …" (RT, p. 203). Clearly this is perjury.

Both Meeks and Minton stories evolved from detailed specific accusation to vague generalizations when those details failed to pan out as not every apartment contains sofas or boxes and every apartment has walls. Fallacies and lies used to justify their unlawful entrance and attempted seizure of the plaintiff. Their stories continue when describing the failed attempted seizure of the plaintiff and the details of the struggle. Meeks' and Minton's depiction of the struggle with the plaintiff fail to match the physical evidence of police discovery or the testimony of Roger Kunesh.

According to their testimonies, Officer Meeks is the hero who stepped between and stopped the plaintiff from attacking Officer Minton; however, both Meeks and Minton describe the plaintiff as attempting to close the door to his apartment.

**Meeks:**

**Officer Julie Adams Report (Exhibit G)**
"[Plaintiff] stepped back into his apartment and started shutting the door. …" "…Meeks used his left hand to stop the door from closing, and pushed the door open. [Plaintiff] leaned into the door again trying to close the door. Meeks pushed the door open and pushing [complaintnant] back.

**Preliminary Eaxmination p. 36-37 (Exhibit P)**
**Page 36 Line 4**

11

A. ... and after I said that, he started to close the door. As the door was closing, I stuck up my hand and told him, "you are under arrest.

**Page 36 Line 19**

Q. When he attempted – attempted to close the door, were you inside the apartment or were you outside or were you straddling in transit?

A. I was still outside.

Q. What did you do when he tried to close the door on you?

A. I stuck my left hand up and stopped the door.

Q. What did the defendant do?

A. He started pushing harder and I pushed back on the door.

**Trial Testimony (RT, pp. 118-119; Exhibit L)**

Q. Now getting back to when the dog was tossed in. My understanding is that at that time [plaintiff] attempted to close the door?

A. He did

Q. And did he simply slam the door, or did he slowly close it, or how did that occur?

A. It was about moderate speed that he was closing it.

Q. What did you do?

A. I took my left shoulder and put it against the door, and I told him he was under arrest.

**Minton:**

**Officer Thomas Slater Report (Exhibit H)**
[Plaintiff then went to shut the door. Officer Meeks stepped forward to stop the door from closing.

**Preliminary Eaxmination p. 36-37 (Exhibit Q)**

Q. What the next thing that happened?

A. He – it all happened fairly quickly, but he – all within a couple of seconds, he attempted to shut the door, and Officer Meeks got in between the door and me.

**Trial Testimony (RT, pp. 162-163; Exhibit M)**

Q. So what happened when you saw the dog?

12

A. I said: Oh, you know, your dog is getting out. And then he grabbed the dog by the tail and grabbed it with his right hand, picked it up waist level and then threw it against the wall behind him. I'm a huge animal lover, so I was immediately like: Oh, my gosh, what are you doing? And then he said: You want some, get some. And then that's when Officer Meeks stepped in between [plaintiff] and I.

**(RT, pp. 204-205)**

A. ... And then Officer Meeks got in between him and I.

Q. Okay. So Officer Meeks stepped towards [plaintiff]?

A. He – Yes. Yes, ma'am.

Q. Okay. So he advanced. And the what was the next thing that happened?

A. The defendant punched Officer Meeks in the nose.

Q. Okay. So did you actually go into the apartment?

A. Yes, ma'am.

Q. Okay. And how did you get into the apartment?

A. When the – Officer Meeks and [plaintiff] were throwing punches. Like I said, you move around. And they had moved into the apartment a little bit to here, and I was – had entered. We don't do anything by ourselves. Don went in, had gotten injured. I – excuse me. Officer Meeks had went in, had gotten hurt, and I went in. We don't ever leave each other alone.

Q. Okay. At one point, though, did [plaintiff] try to close his door?

A. He did.

Q. Okay. And what stopped him from closing his door?

A. Like I said, it was all one – a few seconds, it all just happened so quick. It was "You want some, Get some." He made the movement to shut it and right – it was – like I said, all happened in two seconds. Don got –Officer Meeks got in between me and the door and [plaintiff].

Q. Okay. But do you know what stopped the door from being closed?

A. Officer Meeks.

Q. Okay. And what did Officer Meeks do?

13

A. He got punched by your – the fight – the defendant.

Q. Okay. I'm sorry. At the door, at what time was the door – [plaintiff] trying to close the door?

A. I'm sorry?

Q. What – Did [plaintiff] try to close the door?

A. He did.

Q. Okay. And what stopped him from closing the door? Or did the door close all the way?

A. The door did not – the door maybe moved a half an inch. The door barely moved. Then Officer Meeks prevent the door.

Q. Okay. How did Officer Meeks prevent the door from being closed?

A. His body was there.

It is clear Minton struggles to maintain her portrayal as Meeks being the hero that stopped the big bad plaintiff from attacking her by attempting to shut the door on her. **If it were not for Officer Meeks the door might have been closed.** However, the only consistency to both of their testimonies, and that all parties agree upon, is the fact that the plaintiff attempted to shut his door and retreat to the safety of his apartment and Meeks forcefully prevented that either through pushing it open as he clams or kicking it open as the plaintiff claims.

Both Meeks and Minton claim it was Minton that deployed her taser first (RT, p. 166; RT, pp. 136-137) and it was the hero Meeks that deployed his taser second once again saving Minton from attack. Both striking the complainant in his chest. However, this is not supported by the physical evidence discovered at the scene or the only other objective witness Roger Kunesh who witnessed at least part of the confrontation through the peephole in his door. Officer Minx was one of the first officers on scene after Minton declared "cover now". He

14

writes in his report the exact position of taser serial numbers and the officers they belonged to (Exhibit I):

"I took possession of two taser cartridges left in the hallway. One taser cartridge (Serial Number #C3100F7E5) was still attached to Officer Minton's taser and was found in the main hallway, farthest from the suspect's door. The second cartridge (#T09-2205522) was unattached, and was found closest to the suspect's door. ... I impounded both taser cartridges at Northern Division."

The physical layout of these positions match the depiction of events as Roger Kunesh explains them in his telephone interview (Exhibit O, p. 6-7) and trial testimony (RT, pp. 143-153; Exhibit N). Mr. Kunesh describes looking through his peephole within seconds of hearing pummeling and witnessing the complainant strike Meeks at least once possibly twice. He then describes complainant leaving his field of view towards the main hallway and within seconds return holding his chest in pain and retreating back into his apartment. Kunesh then explains opening the door and seeing the broken taser next to Officer Meeks bleeding on the ground and handing him a towel.

The physical layout described in Officer Minx's report match not only Kunesh's depiction of events, but the complainant's depiction of events as well and are supported by the wounds on the complainant's body. Although the San Diego Police Department failed to provide medical treatment after shoot the complainant two times with taser, which would have documented the complainant's wounds, the complainant's was able to take pictures of his wounds to his left butt cheek/upper thigh where Meeks shot the complainant point blank in the struggle (Exhibit R).

The exaggerated struggle both officers describe is not supported by the physical evidence of the scene. Milton's claims of the exchange between Meeks and the complainant's, the complainant attacking her, her falling to the ground, her miraculously getting back up to use her batton on the complainant, her finding the time to miraculously sheathing her batton as it is not

found lying on the ground, and then drawing her weapon. Surely Mr. Kunesh would have witnessed these exchanges as he peered through his peephole as he was there in seconds. Meeks' claim of standing with his gun drawn instead of lying on the floor bleeding. Is one to believe he went from standing with his gun drawn to lying on the floor as Mr. Kunesh handed him a towel. Fallacies of a proud man.

These claims continue to burden the complainant as Minton continues to claim injuries. The complainant was resentenced under California's amended Penal Code 1170.91 June 19, 2019. At the hearing, Minton claimed a lumbar injury that she incurred in 2017 was a result of the incident with the complainant December 15, 2011 (2 RT, pp. 44-48; Exhibit A). There is no record of the injury in discovery medical records. No mention of it during the trial. No treatment history from the night of the incident. No record of the injury in 2017. Minton went to the doctor 9 days prior to the complainant's resentencing, June 10, 2019, and made the claim. She now uses that 5 word diagnosis (Exhibit S) as support for her restitution claim for $1,265,723.46 lost wages as the 2017 injury has forced her to retire from the San Diego Police Department early. However, if ever, she hurt her lumbar it sure was not the night of December 15, 2011. Her claim is solely exploitation for financial gain at the expense of the complainant.

The San Diego Police Department's culture of policing with violence encourages the use of illegal tactics as used by both Officer Meeks and Minton. Minton struggles to justify covering the plaintiff's peephole (RT, pp. 196-197):

Q. Now, you also said you covered the peephole?

A. Yes, ma'am.

Q. And by covering the peephole, whoever was inside the apartment wouldn't be able to see out?
A. I always announce myself as San Diego Police.

16

Q. Okay. But when they're on the other side of the door, there's no way to verify that you're San Diego Police?

A. There is not.

Q. And does that contribute to officer safety?

A. Does it contribute?

Q. Yes.

A. No, ma'am.

Q. By covering the peephole?

A. No, ma'am. Because when the people open the door and they see this badge, they know that we are police, and that – covering it is for my safety so he doesn't – I mean so he doesn't know where I'm at at the door, so that's why – that's why we do it.

Apparently blocking the peephole of people's houses they approach is standard procedure at the San Diego Police Department. So must kicking in people's doors, attacking them in their homes, escalating incidents, and failing to provide medical treatment after tasing people. Failing to announce themselves as police, and kicking in the complainant's door quickly escalated a mere noise complaint to a standoff with police. When these tactics failed to deliver their desired result, both Meeks and Minton had to create fallacies to explain their behavior and justify their attempted illegal seizure of the complainant. Those fallacies started as detailed and specific accusations and when those accusations failed to pan out and support their claims they grew into vague generalizations. Their depiction of events the night of December 15, 2011 are only supported by each other's manufactured stories. The physical evidence of the scene and the only other witness testimony contradicts these fairy tales they call truth, the whole truth, and nothing but the truth. However, truth does not change.

These fallacies continue to burden the complainant as he still suffers there consequences as drunk conflicted counsel's omission of the physical evidence and failed to challenge these

17

fallacies leading to his conviction, as well as, the recent resentencing and the new claims of injury from Officer Minton as she attempts to exploit the incident for financial gain.

### III. THE PETITIONER'S EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED WHEN SAN DIEGO POLICE BEAT THE PETITIONER WHILE HANDCUFFED AND IN CUSTODY.

Youtube video (Exhibit F) shows SDPD Daniel Niefer and another unidentified SDPD pushing the plaintiff by the arms with his hands handcuffed behind his back into another officer who aggressively walks forward kicking the petitioner in the groin and punching him in the face. The San Diego Police Department's culture of violence had denied the plaintiff his Eighth Amendment right to be free from cruel and unusual punishment.

### Conclusion

The San Diego County failed to provide the plaintiff effective assistance of counsel denying the plaintiff his Sixth Amendment right. The San Diego County court conceded the plaintiff had ineffective assistance of counsel at the Plaintiff's resentencing on June 19, 2019 with assigned trial counsel omitting the plaintiff's VA diagnosis of PTSD from her documentation to support the claim of PTSD. Assigned trial counsel omitted the VA treatment history and diagnosis while submitting a court ordered psychiatric evaluation that said the plaintiff didn't have PTSD. This is the same court that failed to replace that failed to replace assigned counsel after questioning if she was drinking the first two days of trial.

The court failed to assign new counsel after listening to the pleas from the plaintiff throughout the course of the trial complaining of similar conduct; however, relevant to counsel's lack of performance, the omission of case critical evidence, the challenging of witness claims.

Later it was discovered assigned trail counsel had a working relationship with the victims in the case creating a conflict of interest that was never communicated to the plaintiff.

The San Diego Police Department's culture of policing with violence violated the plaintiff's Fourth Amendment right from illegal search and seizure. Officer Meeks and Minton to use illegal practices and procedures when contacting the plaintiff on a complaint. These tactics quickly escalated the situation the night of December 15, 2011. When both officer tactics failed to work in their favor, they created lies to justify their entrance into the plaintiff's home attempting to justify the use of these illegal tactics. These lies continued throughout all legal processes and continue to burden the complaintant through new calims of injuries under current legal proceedings. The violent culture of San Diego Police encouraged the beating of the plaintiff while handcuffed and in custody violating the plaintiff's Eighth Amendment right from cruel and unusual punishment.

## **Verification**

I, Tyler Jordan Torres, declare under penalty of perjury that the foregoing is true and correct.

*[signature]*

Tyler Jordan Torres                          Dated: November 15, 2019

```
DUPLICATE

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS116985
Cashier ID: cdelgado
Transaction Date: 11/15/2019
Payer Name: TYLER TORRES
-------------------------------
CIVIL FILING FEE
 For: TYLER TORRES
 Case/Party: D-CAS-3-19-CV-002182-001
 Amount:        $400.00
-------------------------------
CREDIT CARD
 Amt Tendered: $400.00
-------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00


There will be a fee of $53.00
charged for any returned check.
```